Filed 7/28/15  P. v. Zuniga CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B254935 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA074799) |
| v. | |
| EDWARD MIGUEL ZUNIGA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Lisa M. Chung, Judge.  Affirmed in part, and remanded with directions.

John Doyle, under appointment by the Court of Appeal, for Defendant and Appellant Edward Miguel Zuniga.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant Orlando Steven Burgos.

Kamala D. Harris, Attorney General, Gerard A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Stephanie A. Muyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Appellants Edward Miguel Zuniga and Orlando Steven Burgos were convicted of assaulting Martin Moya Lopez (Moya). Zuniga was separately convicted of extortion, kidnapping for extortion, first degree robbery, and dissuading a witness (Moya's wife Gloria Abarques) by force or threat. Burgos was separately convicted of making criminal threats against Moya. Appellants contend they were denied due process when the trial court precluded them from cross-examining Moya about his immigration status and his application for a U Nonimmigrant Visa (U-Visa). (See 8 C.F.R. § 214.14 [describing U-Visa program, which generally permits victims of certain crimes who cooperate with law enforcement to remain temporarily in the United States despite their immigration status].) Zuniga also challenges certain rulings of the trial court, including denials of motions to suppress and a motion for a new trial. Burgos separately challenges certain sentencing enhancements. The People concede that certain of the sentencing enhancements imposed on Burgos were improper, and request that Burgos's case be remanded for resentencing. Aside from Burgos's sentencing issues, we find no reversible error. Accordingly, we affirm Zuniga's judgment and sentence. We also affirm Burgos's convictions, and remand to the trial court for resentencing on those convictions.

# PROCEDURAL HISTORY

## A. *Zuniga's Convictions and Sentence*

A jury found appellant Zuniga guilty of robbery (count one) and found true the allegations that the robbery was of the first degree, that Zuniga voluntarily acted in concert with two or more other persons, and that a principal personally used a firearm during the commission of the crime. It also found Zuniga guilty of dissuading a witness (count two), and found true the allegation that Zuniga had

used force or a threat. The jury further found Zuniga guilty of assault with a deadly weapon (a knife), extortion and kidnapping for extortion (counts seven, eight, and nine) and found true the allegation that Zuniga caused the victim (Moya) to suffer bodily harm or intentionally confined the victim in a way that created a substantial risk of death. Finally, the jury found true the allegations that all the charged offenses were committed for the benefit of a criminal street gang.

In a bifurcated proceeding, the trial court found that Zuniga had one prior conviction pursuant to Penal Code sections 1170.12, subdivisions (a) through (d), and 667, subdivision (a)(1).[1]

On count one (robbery), the court sentenced Zuniga to 30 years to life, plus five years for the section 667, subdivision (a)(1) enhancement. On count seven (assault with a deadly weapon), the court imposed a total term of 18 years, consisting of eight years, plus five years for the gang enhancement, and five years for the section 667, subdivision (a)(1) enhancement. On count nine, the court imposed a sentence of life without the possibility of parole, plus five years for the 667, subdivision (a)(1) enhancement. The court also imposed concurrent sentences of 19 years to life on count two (dissuading a witness) and 19 years to life on count eight (extortion).

B.    *Burgos's Convictions and Sentence*

A jury found appellant Burgos guilty of criminal threats (count five) and assault with a firearm against Moya (count six). It found true the firearm enhancement allegation (§ 12022.5, subd. (a)) as to count five, and the gang enhancement allegation (§ 186.22) as to both counts. The jury was deadlocked on

---

[1]    All further statutory citations are to the Penal Code, unless otherwise stated.

counts eight and nine (extortion and kidnapping for extortion). After a mistrial was declared as to those counts, the prosecution elected not to proceed on them.

In a bifurcated proceeding, the trial court found that Burgos had two prior convictions pursuant to sections 1170.12, subdivisions (a) through (d), and 667, subdivision (a)(1)), and four prior convictions pursuant to section 667.5, subdivision (b).

The court sentenced Burgos to state prison for a total of 25 years to life, plus 33 years for various enhancements: 10 years for the firearm enhancement, 10 years for the gang enhancement, 5 years for each of the two section 667, subdivision (a)(1) enhancements, and one year for each of the three section 667.5, subdivision (b) enhancements. Pursuant to section 654, the court imposed and stayed a 25-year-to-life sentence for count six (assault with a firearm).

Appellants noticed appeals from the judgments and sentences.

## FACTUAL BACKGROUND

A. *The Prosecution Case*

In 2011 and 2012, Moya and his wife Abarques lived in a house in Panorama City. They allowed a homeless woman, Maya Hermosillo, to live with them for a few months. Moya and Abarques met appellants through Hermosillo and her friends. They knew Zuniga as "Spanks" or "Spanky," and Burgos as "Largo." Based on how Hermosillo and her friends treated Zuniga, Abarques thought that he was a head of the gang. Neither Abarques nor Moya had ever been in a gang.

Moya and Abarques needed a car, and Zuniga offered to sell them one. Shortly thereafter, Zuniga brought a green sedan to their home. Zuniga told Moya and Abarques that they could buy the car for $800, but they declined because the car was not working. After being parked outside their house for a week or two, the

4

car was removed.  A few days later, Zuniga called and told Moya that he and Abarques owed him $800 for the car.  After refusing to pay Zuniga, Moya Abarques noticed that items were missing from their home, including a television, a computer, a printer, and some work tools.  Abarques then asked Hermosillo to leave.

About a week later, on January 6, 2012, Moya and Abarques suffered a home invasion robbery.  That night, Abarques had come home from work around 7:00 p.m.  She was alone in the house; Moya was in the hospital due to illness.  At around 7:30 p.m., Abarques heard someone jumping over the house gate.  When Abarques went to investigate, she met Hermosillo, who told her that Zuniga wanted to speak with her.  Abarques initially refused to open the door, but relented when Hermosillo lifted her shirt to show Abarques a gun and a knife.  Zuniga, Hermosillo and two other individuals then entered and ransacked the house.  Before leaving, Zuniga took the battery out of Abarques's cell phone, and told her not to call the police or they would come back.  Abarques did not immediately call the police because she was scared.

Moya was informed that his wife was looking for him, so he had an acquaintance drive him home from the hospital that evening.  When Moya arrived at his house, he observed several people, one of whom was Hermosillo, taking items out of the house.  Moya did not see Abarques, so he asked the driver to take him to his uncle's house where he spent the night.

The next morning, Hermosillo found Moya at his uncle's house, and told him that Zuniga wanted to speak with him.[2]  Moya initially refused to

---

[2]     On cross-examination, Moya stated he was not sure when he was kidnapped, but that it was about week after the home invasion robbery.  On re-direct, Moya

5

go with Hermosillo to meet Zuniga, but Hermosillo pulled him outside, where three individuals and two cars were waiting. One of the individuals approached Moya with a handgun in her hand, and told him to get into one of the cars. Hermosillo told Moya that if he did not get in the car, "something" would happen to Abarques.

Moya was taken to a garage of an unfamiliar house. There were about 10 people in the garage. Although Hermosillo told Moya that Zuniga was waiting for him, it was Burgos who first met him. Burgos told Moya to sit down, and then started hitting him in the head and back. Burgos then pulled out a gun and told Moya, "I am going to kill you." Moya was afraid, and tried to grab the gun. As he did so, a female bystander hit him on the head with her gun. The remaining bystanders pulled out their guns, and told Moya not to do anything.

Zuniga then came in and asked why Moya was in the garage. When Hermosillo told him that it was a surprise for him, Zuniga responded, "Why do you have him here when I never said for you to bring him?" Zuniga then told Moya that he now owed him $1,600 for the car, and that Moya had 24 hours to pay him. On Zuniga's order, Hermosillo and several others returned Moya to his uncle's house.

Moya told his wife about the kidnapping. Abarques testified that she saw a bruise on Moya's forehead, and that Moya complained about pain in his jaw and the back of his head for days.

A few days after the kidnapping, Moya went to his uncle's house to borrow money to pay Zuniga. After Moya went inside, Zuniga arrived and began beating

clarified that he was kidnapped the morning after the robbery, and that three or four days later Zuniga assaulted him with a knife. Defense counsel also elicited testimony that Moya had told a police detective that he was taken from a park. Moya explained that his uncle's house was located near a park.

6

him up. Zuniga punched him twice, and then took out a knife and hit Moya on the left side of the jaw with the flat of the knife blade. He asked Moya, "Where is my money?" Zuniga demanded Moya's wallet, and took $20 out of it, saying, "I'm going to take this as part of payment of what you owe me." Zuniga then left.

Moya testified he did not immediately report the various incidents to the police because he was afraid. On January 9, 2012, Abarques reported the entire matter to the police because she wanted the perpetrators caught.

Los Angeles Police Detective Manuel Armijo testified he was the original investigating detective on the case. He interviewed Abarques and Moya on January 23, 2012. When the detective interviewed Moya about the kidnapping, he observed that Moya had a bump on his forehead and a swollen cheek. Detective Armijo showed Abarques and Moya a photographic six-pack, and each identified Zuniga's photo. Moya also identified Burgos from a separate six-pack. Detective Armijo testified that he could not locate Moya's uncle to interview him.

About a month after these events, Moya accompanied Detective Armijo to look at some items in a car in impound. Zuniga had been arrested in the car. A knife and some miscellaneous items had been listed during the inventory of the car's contents. The detective thought some of those items might belong to Moya. Moya identified as items that had been stolen from him: a camera, some bolt cutters, a level, and the knife Zuniga had used to beat him up. Moya testified that the knife had been given to him as a gift, but that he had relinquished it to Zuniga after Zuniga asked for it.

In March 2012, Abarques and Moya had a telephone conversation with Zuniga. Zuniga told Abarques that if she and Moya did not testify

7

about the matter, "everything would be okay" and they would be left alone. Abarques assured Zuniga she would not testify.

Detective Armijo testified that a standard investigative technique was to record all outgoing jailhouse calls of a suspect. During the investigation, Detective Armijo learned that Zuniga had made phone calls to the victims from jail. Zuniga also made two jailhouse calls to his wife, Vicky Contreras, during which he gave directions for her to relay to other gang members. The recorded calls were played for the jury

A week after speaking with Zuniga over the phone, Abarques visited Zuniga's house and stayed over for three days. Abarques wanted Contreras and Zuniga to think they were all still friends, and also wanted to see if any of the items missing from her home were at Zuniga's residence. Abarques observed a computer, printer and certain tools she thought belonged to Moya.

During the visit, Contreras told Abarques that if Zuniga was sentenced to life in jail, "anywhere we [Abarques and Moya] run or hide, they will find us." Moya and Abarques were subsequently relocated. They were relocated again after Abarques informed Detective Armijo that a man named "Carlos" had visited her at her new residence.

Approximately two months before trial, on November 22, 2013, Abarques received three text messages on her cell phone, calling her a "rata" or "rat," and saying "payback time." Abarques informed Detective Vasquez about the threatening texts, but did not tell the prosecutor until just before trial.[3]

Serena Carranza testified that she had known Zuniga since 2005, and had used drugs with him. Carranza was afraid of Zuniga because he was a "shot

---

[3]     Trial counsel moved for a mistrial due to delayed disclosure of the threats to Abarques, which the trial court denied.

8

caller" -- someone who sends others to do his "dirty work" -- for his gang, the Pacoima Flats. In January 2012, Zuniga came to her home one morning and bragged about beating up a "Mexican" named "Marcos" or "Martin" who owed him money for a car. Zuniga also showed her the knife he used to beat up the man. When shown a picture of the knife Moya had previously identified, Carranza testified it was the same knife. Carranza stated that after she had agreed to testify against Zuniga, she was beaten up and told not to testify. She hid for a while, but decided to testify because it was the "right thing to do."

Carranza admitted being a former member of the Langdon Street gang, and having suffered multiple felony convictions, including convictions for passing false checks and grand theft auto. Carranza also admitted that she had an agreement with the prosecutor's office to testify truthfully in the instant matter in return for a sentence of time served on a charge of receiving stolen property. On cross-examination, Carranza admitted giving a false name and date of birth to law enforcement in the recent case. She also admitted using a number of aliases over the last few years.

Officer Timo Peltonen testified as an expert on the Pacoima Trece gang. Officer Peltonen stated that the gang was on friendly terms with other gangs in the Pacoima area, except the Pacoima Van Nuys Boys gang. He admitted being unaware of any crimes committed by the Pacoima Trece gang in conjunction with the Pacoima Flats gang. The officer testified that Burgos was a self-admitted member of the Pacoima Trece gang, with the moniker Largo. He also opined that Burgos was a "shot caller" in the gang. Presented with a hypothetical that mirrored the facts of this case, Officer Peltonen opined that the crimes were committed in

9

association with and for the benefit of the Pacoima street gangs because the gangs would benefit from the fear and terror engendered by the crimes.

Officer Andre Silva testified as an expert on the Pacoima Flats gang. He testified that Zuniga was a self-admitted member of the gang with the monikers "Big Spanks," "Spanky" or "Eddie Boy." He also testified that Zuniga was a shot caller for the Pacoima Flats gang, that Contreras was an active Pacoima Trece gang member, and that her brother Carlos was an active Pacoima Trece gang member. Presented with a hypothetical that mirrored the facts of the instant case, Detective Silva opined that the crimes benefitted the Pacoima Flats gang because the gang gained monetary benefits and increased the fear and intimidation within the community.

B.    *The Defense Case*

Appellants did not present a defense case.

## DISCUSSION

Appellants contend their convictions should be reversed because they were precluded from cross-examining Moya about his status as a holder of a U-Visa. Appellant Zuniga separately contends that the trial court erred in denying his motion to suppress Moya's identification of items found in the car Zuniga was driving when arrested, and his motion to suppress the victims' identification due to an allegedly unduly suggestive identification procedure. Zuniga further contends that the trial court abused its discretion when (1) the court permitted the prosecutor to clarify Moya's testimony regarding Zuniga's reaction to seeing him in the garage; (2) the court denied his motion for a mistrial based on the delayed disclosure of threats to Abarques; and (3) the court restricted his cross-examination of Carranza and denied his motion for a new trial based on newly discovered evidence that Carranza had lied about being subject to witness intimidation.

10

Appellant Burgos separately contends that a firearm enhancement and a gang enhancement were both imposed during sentencing when only the greater enhancement should have been imposed.   For the reasons stated below, we conclude that Burgos's sentence was improper and the matter should be remanded for resentencing as to him.  Aside from Burgos's sentence, we find no reversible error.

A.      *Moya's Immigration Status and Application for a U-Visa*

Appellants contend they were denied due process and the right to present a defense when the trial court precluded them from presenting evidence that Moya, an undocumented Mexican national who had previously been deported and had returned illegally to the United States, had been permitted to remain in the United States temporarily pursuant to a U-Visa.

1.      *Relevant Factual Background*

At trial, prior to jury selection, Zuniga's counsel argued that Moya's status as a holder of a U-Visa should be admitted on a limited basis because it was relevant to Moya's motivation to testify in the case.  The prosecutor responded that her office was not responsible for granting the U-Visa; rather, "[w]e just confirm that he is a witness in the case and being cooperative."

In a declaration accompanying Moya's October 18, 2012 U-Visa application, he stated:  "I am applying for a U-Visa based on the horrific kidnapping, extortion, and felonious assault I fell victim to on or about January 7, 2012."  The declaration also provided factual details about the crimes.  At a later hearing on the issue, the prosecutor conceded that Moya's declaration might have impeachment value if the statements in the declaration were inconsistent with Moya's trial testimony, but sought to have the declaration "sanitized" to remove

any mention that Moya was "on a U Visa or that he's been deported for his status in the United States."

After reviewing the application, the trial court ruled that defense counsel would be allowed to cross-examine Moya about any inconsistencies between the statements in the declaration and his trial testimony. However, defense counsel would be precluded from inquiring about (1) Moya's application for a U-Visa, (2) the fact that Immigration and Customs Enforcement (ICE) had placed a hold on him, or (3) the fact that he was paroled into the United States on October 18, 2012. The court noted that no evidence demonstrated that the prosecution had extended leniency, or that any agency had conditioned the granting of the U-Visa based on the specifics of Moya's testimony. The court also determined under Evidence Code section 352 that the admission of evidence of Moya's status as a holder of a U-Visa and his prior dealings with ICE invited "undue speculation" and had the potential for "undue prejudice" on matters that did not bear a sufficiently close connection to Moya's credibility.

Defense counsel did not cross-examine Moya concerning any statements he made in the U-Visa declaration describing the events underlying the charged crimes.

2.      *Analysis*

"A criminal defendant has a constitutionally guaranteed right to confront and cross-examine the witnesses against him or her. [Citations.]" (*People v. Carter* (2005) 36 Cal.4th 1114, 1172.) "'The constitutional right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility.'" (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 118, quoting *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 841-842.) "The right of confrontation is not absolute, however, and may 'in appropriate cases' bow to other legitimate

12

interests in the criminal trial process. [Citations.]" (*People v. Carter*, *supra*, 36 Cal.4th at p. 1172.) For example, "'reliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 455, quoting *People v. Brown* (2003) 31 Cal.4th 518, 544-545.)

Here, pursuant to Evidence Code section 352, the trial court precluded defense counsel from exploring whether Moya had an incentive to lie about the charged offenses due to his U-Visa status. We conclude the trial court erred in restricting defense counsel's cross-examination of Moya, because his eligibility for a U-Visa resulted from his having been a victim of the charged offenses. Thus, Moya's status as a holder of a U-Visa was relevant to show motive and/or bias, and was relevant to his credibility. (See *Briggs v. Hedgpeth* (N.D. Cal. Jan. 22, 2013, No. C 11-3237 PJH) 2013 U.S. Dist. LEXIS 8641, *34 [preclusion of cross-examination on victim's immigration status and availability of immigration benefits violated defendant's right to confrontation, though error found harmless]; *Oregon v. Del Real-Garvez* (Or.Ct.App. 2015) 346 P.3d 1289, 1290] [evidence that victim knew her mother's immigration status and knew mother had applied for a U-Visa based on victim's allegations against defendant was relevant impeachment evidence].) Accordingly, the trial court abused its discretion in precluding defense counsel from cross-examining Moya about his status as a holder of a U-Visa.[4]

_____

[4] Appellants also contend the trial court erred in precluding, under Evidence Code section 352, any cross-examination of Moya on the fact that he had illegally returned to the United States after being deported, arguing that the illegal reentry was a crime of moral turpitude. Assuming illegal reentry is a crime of moral turpitude, no evidence suggests that Moya suffered a felony conviction for illegal reentry. (See *People v. Maestas* (2005) 132 Cal.App.4th 1552, 1556 ["Any felony

13

On this record, however, we find the error was harmless beyond a reasonable doubt. (See *People v. Geier* (2007) 41 Cal.4th 555, 608 ["Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24."].) Moya provided his account of the kidnapping, extortion, and assault, along with appellants' respective roles in the crimes, a full eight months before he applied for the U-Visa, rendering any inference that his account was intended to bolster his application for temporary residence in the United States speculative at best. Although he made some inconsistent statements to Detective Armijo about aspects of the crimes, he consistently described the nature of the offenses and each appellant's criminal conduct.

To the extent Moya's U-Visa declaration may have contained statements inconsistent with his prior statements to Detective Armijo, appellants were permitted to impeach him with the declaration, but elected not to do so. Both counsel did, however, cross-examine Moya on his prior inconsistent statements to Detective Armijo. On this record, we conclude beyond a reasonable doubt that a rational jury would have found appellants guilty absent the error. (See *Briggs v. Hedgpeth, supra*, 2013 U.S. Dist. LEXIS 8641, *45-*47 [preclusion of cross-examination on immigration status and availability of immigration benefits harmless where victim had given prior statements to investigating officers before

conviction necessarily involving moral turpitude may be used to impeach a witness at a criminal proceeding."].) Moreover, the admissibility of any such conviction rests within the trial court's discretion, and the court may exclude the evidence under Evidence Code section 352. (*People v. Castro* (1985) 38 Cal.3d 301, 306.) The trial court's determination that the probative value of Moya's illegal reentry was substantially outweighed by the probability its admission would create undue prejudice was within the court's discretion. Accordingly, we find no error.

they mentioned possibility of seeking U-Visa as crime victim, and defense counsel had cross-examined victim on several inconsistencies in prior statements].)

B.    *Motions to Suppress*

Appellant Zuniga contends the trial court erred in denying his pretrial motion to suppress Moya's identification of the knife and other items in the impounded car, as it was the result of a warrantless search in violation of the Fourth Amendment.  He further contends the court erred in denying his motion to suppress the pretrial and in-court identification of him by the victims, arguing that the pretrial photographic lineup was unduly suggestively and tainted the subsequent in-court identification.  In reviewing a trial court's ruling on a motion to suppress, we defer to the trial court's findings of fact, both express and implied, if supported by substantial evidence.  We independently apply the pertinent legal principles to those facts to determine whether the motion should have been granted.  (*People v. Carter*, *supra*, 36 Cal.4th at p. 1140.)

1.    *Moya's Identification of Items in Impounded Car*

As detailed above, Moya accompanied Detective Armijo to an impound yard and identified several items found in the trunk of a car.  Prior to trial, appellant moved to suppress Moya's identification, arguing it resulted from a warrantless search.

At the hearing on the suppression motion, Los Angeles Police Officer Anthony Lopez testified he had initiated a traffic stop on February 14, 2012.  Eventually, Zuniga -- who was driving the vehicle -- pulled into a driveway of a house and exited.  He was arrested without incident, and the car was impounded.  Officer Lopez testified he impounded the vehicle because Zuniga did not live at the

15

house, it was blocking the driveway, and there were no other locations in the area to park it. Officer Lopez followed the police department's standard procedures for impounding a vehicle, including conducting an inventory search. During the inventory search, Officer Lopez found a long knife, a level, and miscellaneous tools. He filled out a report detailing the items found during the search, and listed "a safe, clothing, multiple knives, and miscellaneous items."

Detective Armijo testified at the hearing on the suppression motion. According to the detective, on February 15, 2012, he was informed that a vehicle driven by Zuniga was in the impound yard. Accompanied by Moya, Detective Armijo went to the impound yard to determine whether the vehicle contained items stolen from Moya's house as part of the home invasion robbery. Moya had previously identified Zuniga as one of the robbers. When the trunk of the vehicle was opened, Moya immediately identified a knife that had belonged to him that he had given to Zuniga. Moya also identified a camera and several tools as belonging to him.

After receiving supplemental briefing, the trial court denied the motion to suppress. The court determined (1) that the vehicle was lawfully impounded as it was blocking a driveway; (2) that the inventory search was lawful because it was conducted pursuant to standard police procedures; and (3) that Detective Armijo's "look at the property with the victim" was lawful, as the detective was already aware of the items in the vehicle, and the items could be examined to determine if they were stolen

On this record, we independently conclude that the motion to suppress was properly denied. First, the impounding of the vehicle was proper as part of the police's community caretaking function. (See, e.g., *Halajian v. D & B Towing* (2012) 209 Cal.App.4th 1, 15 ["In the role of 'community caretaker,' peace

16

officers may impound vehicles that jeopardize public safety and the efficient movement of vehicular traffic".) Here, appellant was not the registered owner of the vehicle, the vehicle was blocking another individual's driveway, and there was no other licensed driver in the vehicle to drive it away. Thus, it was reasonable for Officer Lopez to impound the vehicle to allow the homeowner access to the street. (See *People v. Steeley* (1989) 210 Cal.App.3d 887, 892 [officer properly impounded vehicle where no other licensed driver was in the vehicle, vehicle was blocking a driveway, and appellant was not the registered owner of the vehicle]; cf. *Miranda v. City of Cornelius* (9th Cir. 2005) 429 F.3d 858, 866 [unreasonable under circumstances to impound vehicle parked in licensed owner's home driveway].)

Appellant's reliance on *People v. Torres* (2010) 188 Cal.App.4th 775 is misplaced. There, the vehicle was parked in a stall in a public parking lot. (*Id*. at p. 780.) In contrast, here the vehicle was parked in the home driveway of a person who was not the vehicle's owner, blocking the homeowner's access to the street. Thus, the car was properly impounded to facilitate the efficient movement of vehicular traffic.

Because the impound was proper, the subsequent inventory search, conducted pursuant to standard police department procedures, also was proper. (See *South Dakota v. Opperman* (1976) 428 U.S. 364, 373 [warrantless inventory search of glove compartment of lawfully impounded automobile, conducted pursuant to standard police procedures, does not violate Fourth Amendment's proscription against unreasonable searches and seizures]; accord, *People v. Williams* (2006) 145 Cal.App.4th 756, 761 ["If officers are warranted in impounding a vehicle, a warrantless inventory search of the vehicle pursuant to a standardized procedure is constitutionally reasonable"].)

17

Finally, Detective Armijo's examination of the items in the trunk of the impounded was lawful. As California courts have noted, "'[o]nce articles have lawfully fallen into the hands of the police they may examine them to see if they have been stolen, test them to see if they have been used in the commission of a crime, return them to the prisoner on his release, or preserve them for use as evidence at the time of trial.'" (*People v. Superior Court (Gunn)* (1980) 112 Cal.App.3d 970, 974 (*Gunn*), quoting *People v. Rogers* (1966) 241 Cal.App.2d 384, 389-390.) Appellant already had been identified as a suspect in a home invasion robbery. Thus, it was reasonable for Detective Armijo to bring the robbery victim to identify whether the items found in the vehicle and itemized during the inventory search belonged to the victim.

Appellant attempts to distinguish *Gunn*, on the ground that it involved a prior booking search, whereas a prior inventory search was involved here. We discern no constitutional difference between a booking search and an inventory search. The United States Supreme Court has noted that it first recognized the warrantless inventory search of an automobile as an exception to the Fourth Amendment's warrant requirement in *South Dakota v. Opperman*, *supra*, 428 U.S. 364, and subsequently *extended* the same rationale supporting a warrantless inventory search (protecting suspect's property and deterring false claims of theft against police) to a warrantless booking search. (See *Illinois v. Lafayette* (1983) 462 U.S. 640, 647-648.)

Likewise, appellant's reliance on *People v. Evans* (2011) 200 Cal.App.4th 735 is misplaced. There, the parties agreed that the initial search and a subsequent search at an impound yard were not justified as an inventory search. (*Id*. at p. 743.) The People make no similar concession here. Indeed, we have determined that the initial search by Officer Lopez was a lawful inventory search.

In short, the trial court did not err in denying appellant's motion to suppress Moya's identification of the items in the impounded car.

        2.     *The Victims' Identification of Zuniga from Photographic Six-packs*

On January 23, 2012, Detective Armijo showed six photographs of Hispanic males to Abarques and Moya separately; each identified Zuniga's photograph. His photograph was the only one in which the depicted individual had tattoos; the tattoo letterings were just below the neck. Prior to trial, Zuniga moved to suppress the victims' identification on the ground that the photographic lineup was unduly suggestive. The trial court denied the motion. The court found that the basic facial features, clothing, hair, and facial hair were similar; that the depicted individuals were male Hispanics; and that although appellant was the only individual with tattoo lettering on the lower neck, the victims had had prior contacts with appellant, and tattoos were not the "primary issue in terms of how [they] described" appellant to law enforcement.

Appellant Zuniga contends (1) that the trial court erred in denying his motion to suppress the pretrial photographic identification of the victims, and (2) that the victims' in-court identifications were tainted by the prior unduly suggestive identification. We disagree.

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances . . . ." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) "The defendant bears the burden of demonstrating the existence of an unreliable identification procedure." (*Ibid.*)

19

We have examined the photographic lineup, and observe that all six male Hispanics depicted in the six-pack look similar. Although appellant was the only individual with tattoo lettering, the tattoos did not cause appellant to "stand out" in such a way as to suggest to the victims that they should select that picture. Thus, the identification procedure was not unduly suggestive.

Moreover, "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons v. United States* (1968) 390 U.S. 377, 384; accord, *People v. Cunningham*, *supra*, 25 Cal.4th at p. 990.) The record belies any likelihood of misidentification. Both victims had encountered Zuniga multiple times before the charged offenses occurred, and Moya testified Zuniga had personally asked him for a knife. During the commission of the crimes, Zuniga made no effort to hide his identity. Indeed, during the home invasion robbery, Zuniga told Abarques not to call the police, and during the kidnapping, Zuniga told Moya he was owed $1,600 for the car. During the assault on Moya a few days after the kidnapping, Zuniga personally took money from Moya's wallet. Finally, Zuniga's defense was not that he had been misidentified by the victims, but rather that the victims' testimony was inconsistent and not credible. In short, appellant has failed to demonstrate any reversible error arising from the pretrial photographic lineup.

C.    *Examination of Moya Regarding the Kidnapping*

Appellant Zuniga next contends the trial court erred in permitting the prosecutor, over defense objection, to ask Moya to clarify his testimony about Zuniga's reaction to seeing Moya in the garage during the kidnapping incident. We discern no error.

20

### 1. *Relevant Factual Background*

During direct examination, Moya -- who was using the services of a Spanish interpreter -- testified that after he was taken to the garage, Burgos assaulted him. Thereafter, appellant Zuniga entered and expressed surprise, asking Hermosillo, "why did they have me there." The prosecutor then asked, "when he asked Maya [Hermosillo] why did you bring him here? Is that what he said? Why did you bring him here?" Moya responded: "Yes. No. No. He said, why do you have him here when I never said for you to bring him?" Prosecutor: "Bring him here? Is that what he said?" Moya: "No, no, no. To the garage." Prosecutor: "So he said, I never told you to bring him to the garage?" Appellant's counsel objected on the ground that the prosecutor was misstating the evidence. The prosecutor stated she was trying to clarify Moya's testimony, and the trial court overruled the objection. Moya then answered, "Yes."

During closing arguments, the prosecutor argued that Moya's testimony demonstrated that Zuniga was surprised Moya had been taken to the garage, not that Zuniga was surprised the kidnapping had occurred. Defense counsel countered that Moya's testimony showed Zuniga was upset that Moya had been kidnapped.

### 2. *Analysis*

On appeal, Zuniga suggests that the prosecutor's conduct was misconduct and implicates the prosecution's obligations under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). We discern no *Brady* violation, as the prosecutor's conduct did not involve any suppression of favorable and material evidence. To the extent appellant raises a prosecutorial misconduct claim, he has failed to preserve that claim by making a timely and specific

21

objection below. (See *People v. Adams* (2014) 60 Cal.4th 541, 568-569 [claim of misconduct forfeited where defendant never objected to prosecutor's comments during opening arguments and failed to seek an admonition].) Finally, as trial counsel objected only on the basis that the prosecutor misstated the evidence, appellant cannot challenge the trial court's evidentiary ruling on any other ground. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 674 [failure to object on specific ground at trial forfeits appellate challenge on same ground].)

On the merits of Zuniga's claim, he has not shown the trial court erred in overruling his objection to the prosecutor's question as misstating Moya's testimony. Moya's initial testimony about Zuniga's reaction to seeing him in the garage was ambiguous. Based on that initial testimony, it could be inferred that appellant was surprised Moya had been kidnapped. Likewise, the same testimony supported an inference that appellant was surprised Moya had been taken to the garage, rather than another location. The prosecutor's question sought to clarify that testimony. As Moya's own affirmative answer confirmed, the prosecutor's question did not misstate the testimony.

D. *Delayed Disclosure of Threats Against Abarques Prior to Trial.*

As detailed above, Abarques received three threatening messages in November 2013, calling her a rat or a snitch and threatening payback for her trial testimony. Although Abarques promptly disclosed the threats to the police, the prosecutor was not informed of them until the morning of trial, and defense counsel was not informed until mid-trial. The threats were not made by Zuniga or his wife Contreras.

Defense counsel moved for a mistrial, which the trial court denied on the ground that the delayed disclosure did not "rise[] to the level of a mistrial." The court granted defense counsel time to prepare to cross-examine Abarques on the

22

threats, stating "[w]e can take a break for you to explore it." Although defense counsel raised the possibility of an instruction on the delayed disclosure, the court indicated it was not inclined to give the instruction. The court permitted defense counsel to "go into the timing of when it was disclosed."

Zuniga contends the trial court erred in denying his motion for a mistrial and in precluding any possibility of an instruction on the delayed disclosure under CALCRIM No. 306. We discern no reversible error.

### 1. *Mistrial Motion*

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" (*People v. Haskett* (1982) 30 Cal.3d 841, 854.) A motion for a mistrial should be granted when "'"a [defendant's] chances of receiving a fair trial have been irreparably damaged."'" (*People v. Ayala* (2000) 23 Cal.4th 225, 282, quoting *People v. Welch* (1999) 20 Cal.4th 701, 749.)

Here, appellant has not demonstrated that his chance of receiving a fair trial was irreparably damaged. The jury already had heard ample evidence that Abarques had been threatened by Zuniga and Contreras about testifying against appellant. Abarques had testified that during the home invasion robbery, Zuniga told her not to call the police or he and his fellow gang members would come back. She also had testified that Zuniga told her if she did not testify, everything would be okay. Abarques had further testified that Contreras, appellant's wife, told her that if appellant was

23

sentenced to life in state prison, "anywhere we run or hide, they will find us." Moreover, the trial court permitted defense counsel to cross-examine Abarques about the additional threats in November 2013, and granted defense counsel time to prepare for the cross-examination. In short, we discern no abuse of discretion in the trial court's denial of the mistrial motion.

### 2. *Jury Instruction on Delayed Disclosure*

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies."' [Citation.] Evidence subject to disclosure includes . . . any '[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts.' . . . 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. (§ 1054.7.)' [Citation.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280.) "Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute . . . . (§ 1054.5, subd. (b).) The court may also 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.' (*Ibid*.) A violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. [Citation.]" (*Id*. at pp. 279-280.)

Here, appellant was not prejudiced because the trial court granted defense counsel time to prepare to cross-examine Abarques about the additional threats.

(See *People v. Verdugo*, *supra*, 50 Cal.4th at p. 281 [no prejudice from violation of section 1054.1 where defense counsel had time to prepare for cross-examination on previously undisclosed evidence].) As a result, no instruction regarding delayed disclosure of the threats was required. Moreover, the jury already had heard ample evidence that Abarques had been threatened about the consequences of her testifying. Thus, any error in failing to instruct the jury regarding delayed disclosure would have been harmless under any standard of reversible error. (*Chapman v. California*, *supra*, 386 U.S. at p. 22; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

E.    *Serena Carranza's Testimony*

At trial, Carranza testified that Zuniga had bragged about assaulting with a knife a "Mexican" named "Martin," who owed him money for a car. Carranza stated that after she had agreed to testify against Zuniga, she had been beaten up and told not to testify. She admitted that she was a former gang member, that she had suffered multiple felony convictions, that she had an agreement to testify in return for a more lenient sentence in another matter, that she had given a false name and date of birth to law enforcement in that matter, and that she had used a number of aliases over the last few years

Appellant Zuniga contends (1) that the trial court erred when it precluded him from cross-examining Carranza more fully about her false aliases, and (2) that the court erred in denying a motion for a new trial based on newly discovered evidence that Carranza had lied about being threatened.

1.    *Cross-examination*

During cross-examination, appellant's counsel elicited testimony that Carranza had given a false name (Natalia Guevarra) and birthdate to law

25

enforcement in her pending criminal matter. When counsel asked Carranza if she had used the alias "Cindy Colley," the prosecutor requested a sidebar. During the sidebar, the prosecutor argued that the specific aliases were irrelevant and sought to exclude further inquiry under Evidence Code section 352. The court noted that it had allowed defense counsel to elicit a number of aliases, and asked counsel how many more aliases he wanted to elicit. Counsel replied that he had eight additional aliases. The court excluded an "itemized list" of aliases under Evidence Code section 352, but permitted counsel to ask Carranza if she had used a number of aliases over the past few years.

When defense counsel asked Carranza if she had used eight aliases over the past few years, Carranza denied doing so. Counsel then asked to refresh Carranza's recollection, but the trial court refused. Counsel asked Carranza if she had used the alias "Serena Cole" when interviewed regarding the threats she had allegedly received. Carranza admitted using the alias, initially stating that it was her maiden name, but later admitting it was her sister's name. Defense counsel then asked, "So it's fair to say that over the last few years you have used fictitious names, false names?" Carranza responded, "Yes." She also admitted lying to police.

Appellant contends the court erred in restricting his cross-examination of Carranza. We disagree. "'The constitutional right of confrontation includes the right to cross-examine adverse witnesses on matters reflecting on their credibility.'" (*People v. Ardoin*, *supra*, 196 Cal.App.4th at p. 118.) However, the proper application of "'Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination.'" (*People v. Pearson*, *supra*, 56 Cal.4th at p. 455.) Here, the trial

court excluded further inquiry into the specific aliases used by Carranza under Evidence Code section 352. Carranza admitted using a number of aliases over a period of years. The trial court's determination that further inquiry into the specific aliases would have entailed undue consumption of time while providing evidence of only marginal impeachment value was well within its discretion. Accordingly, the trial court did not err in limiting appellant's cross-examination.

Moreover, had we found error, we would deem it harmless under any standard of reversible error. (*Chapman v. California*, *supra*, 386 U.S. at p. 22; *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) Carranza's credibility had been significantly impeached. She had admitted being a former gang member, suffering multiple felony convictions involving moral turpitude, testifying in exchange for lenient treatment in a pending criminal matter, using multiple aliases, and lying to the police. On this record, had defense counsel been able to cross-examine Carranza about all her aliases, we conclude beyond a reasonable doubt that a rational jury would still have found appellant guilty.

2. *Motion for a New Trial*

After the jury rendered its verdict, defense counsel moved for a new trial, based on a police report concluding that Carranza's claim of witness intimidation could not be substantiated. Counsel noted that the report's "bottom line" was that "the police said she's a damn liar and we don't believe her." The prosecutor argued that "there were two threats [against Carranza examined] in this report, and one of them is fairly substantiated in the fact that we found a phone in the . . . jail cell of the person that called her from jail. So this report does not mean that she's lying. It just means that we don't have enough evidence to file these charges [of witness intimidation] beyond a reasonable doubt. . . ." The prosecutor also noted

27

that even if Carranza had been mistaken about certain facts, she had always been adamant that the threats occurred.

The trial judge denied the motion for a new trial, determining it was not reasonably probable that there would have been a different trial result, as the victims' testimony substantiated the charges, and the impeachment value of the police report was collateral.

Appellant Zuniga contends the trial court abused its discretion in denying the motion for a new trial, because Carranza's testimony that she was subject to threats bolstered her credibility with the jury. We disagree.

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: '"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits."' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.) "'"'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.'"'" (*Ibid.*, quoting *People v. Williams* (1988) 45 Cal.3d 1268, 1318.)

Here, Carranza's claims of witness intimidation could not be shown beyond a reasonable doubt. However, the police report did not prove that Carranza was lying. Moreover, as detailed above, Carranza's credibility had been significantly impeached. Additionally, her testimony merely corroborated the victims' testimony. The victims had testified about the charged offenses, and also testified that they had experienced witness intimidation. On this record, we discern no error

28

in the trial court's determination that it was not reasonably probable that a different result would occur on a retrial. Accordingly, appellant has not shown the trial court abused its discretion in denying the motion for a new trial.

F.  *Sentencing Errors Regarding Appellant Burgos*

As detailed above, on count five (criminal threats), the trial court imposed a 10-year firearm enhancement pursuant to section 12022.5, subdivision (a) and a 10-year gang enhancement pursuant to section 186.22, subdivision (b)(1)(C). Appellant Burgos contends that under section 1170.1, subdivision (f), only the greater of the two enhancements may be imposed. The People concede the sentencing error, and request that this court remand for resentencing. (See *People v. Rodriguez* (2009) 47 Cal.4th 501, 508-509 [where trial court imposed 10-year enhancements under sections 12022.5 and 186.22, subdivision (b)(1)(C) based on use of single firearm, reversing sentence and remand for resentencing].) We agree and, accordingly, reverse and remand to the trial court to restructure its sentencing choices in light of this opinion.

In a related contention, appellant Burgos also contends the trial court erred in imposing a 10-year enhancement on the gang allegations due to a clerical error or confusion about the proper sentencing statute. As we are remanding the matter for resentencing, the trial court may reconsider the 10-year gang enhancement as appropriate.

## DISPOSITION

With respect to appellant Zuniga, the judgment is affirmed. With respect to appellant Burgos, the convictions are affirmed and the matter is remanded to the trial court for resentencing in compliance with section 1170.1, subdivision (f).

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, J.

We concur:

EPSTEIN, P. J.

COLLINS, J.

30